Case No. 25-1776

In the United States Court of Appeals

for the Sixth Circuit

**JEREECE NOEL**

**Plaintiff-Appellant,**

v.

**CHALLENGE MANUFACTURING
HOLDINGS, INC.,**

**Defendant-Appellee**.

**On Appeal from**
The United States District Court
for the Eastern District of Michigan
Docket No. 2:23-cv-12982
The Honorable Laurie J. Michelson, District Judge

**PLAINTIFF-APPELLANT JEREECE NOEL'S BRIEF ON APPEAL
ORAL ARGUMENT REQUESTED**

CARLA D. AIKENS, P.L.C.
Carla D. Aikens (P69530)
Connor B. Gallagher (P82104)
615 Griswold St., Ste. 709
Detroit, MI 48226                      January 14, 2026

1

# **TABLE OF CONTENTS**

INDEX OF AUTHORITIES.........................................................................3

STATEMENT REQUESTING ORAL ARGUMENT ...............................4

JURISDICTIONAL STATEMENT ........................................................5

STATEMENT OF ISSUES .....................................................................6

INTRODUCTION ...................................................................................8

STATEMENT OF FACTS ......................................................................8

SUMMARY OF THE ARGUMENT .....................................................15

ARGUMENT .........................................................................................21

CONCLUSION AND REQUESTED RELIEF ......................................40

CERTIFICATE OF COMPLIANCE.....................................................41

ADDENDUM .........................................................................................42

CERTIFICATE OF SERVICE ..............................................................43

# INDEX OF AUTHORITIES

**Cases**

*Anderson v Liberty Lobby, Inc.*, 477 U.S. 242 (1986)...................................... 17, 21

*Beacon Theatres, Inc. v. Westover*, 359 U.S. 500 (1959).........................................17

*Bobo v UPS,* 665 F3d 741(6th Cir. 2012)...................................................32

*Chapman v. Brentlinger Enters.*, 124 F.4th 382 (6th Cir. 2024)............................21

*Dews v AB Dick Co*, 231 F3d 1016 (6th Cir. 2000) ......................................... 18, 35

*Dixon v WW Granger*, 168 Mich App 107, 116-117; 423 NW2d 580 (1987)........37

*Ercegovich v Goodyear Tire & Rubber Co,* 154 F3d 344 (6th Cir. 1998)....... 19, 32

*Harris v Forklift Sys,* 510 US 17; 114 S Ct 367; 126 L Ed 2d 295 (1993) ...... 18, 25

*Harrison v Metropolitan Govt of Nashville,* 80 F3d 1107 (6th Cir 1996) .............37

*Jackson v Quanex Corp,* 191 F3d 647(6th Cir. 1999)..............................................26

*Logan v Denny's, Inc.*, 259 F3d 559 (6th Cir 2001) ......................................... 37, 38

*Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516 (6th Cir. 2008) ...........................29

*Montell v Diversified Clinical Servs,*757 F3d 497 (6th Cir. 2014)................... 18, 30

*Reeves v Sanderson Plumbing Prod,* 530 U.S. 133 (2000) ............................... 19, 36

## STATEMENT REQUESTING ORAL ARGUMENT

Plaintiff-Appellant Jerreece Noel respectfully requests that this Court grant oral argument pursuant to Fed. R. App. P. 34(a). This appeal presents significant questions of law and fact regarding the proper application of summary judgment standards in employment discrimination cases. Specifically, this Court must decide whether the district court improperly invaded the province of the jury by weighing the credibility of witness testimony regarding racial bias, disregarding valid comparator evidence in a gender discrimination claim, and failing to consider the "lying in wait" in the context of retaliation. Oral argument would materially assist the Court in analyzing the complex factual record and correcting the district court's erroneous application of the legal standards for evaluating disparate treatment and the weighing of evidence.

## JURISDICTIONAL STATEMENT

This is an appeal from a final judgment of the United States District Court for the Eastern District of Michigan, Southern Division. The district court had original jurisdiction over Plaintiff's federal claims under 28 U.S.C. § 1331 (federal question) as they arose under Title VII of the Civil Rights Act of 1964 and 42 U.S.C. § 1981. The Court had supplemental jurisdiction over Plaintiff's state law claims under 28 U.S.C. § 1367.

The district court entered its Opinion and Order Granting Defendant's Motion for Summary Judgment on July 29, 2025. (R. 27, PageID.984). Plaintiff-Appellant filed a timely Notice of Appeal pursuant to Fed. R. App. P. 4(a)(1)(A). This Court has jurisdiction over this appeal pursuant to 28 U.S.C. § 1291.

s

## **STATEMENT OF ISSUES**

I.      Whether Plaintiff's claims of racial discrimination survive as a matter of law, creating a genuine issue of material fact regarding discriminatory animus?

Plaintiff-Appellant says:  Yes.

Defendant-Appellee likely says:    No.

II.     Whether Plaintiff's claim of hostile work environment survives as a matter of law and subjected to demeaning treatment created an abusive working environment that the district court improperly dismissed?

Plaintiff-Appellant says:  Yes.

Defendant-Appellee likely says:    No.

III.    Whether Plaintiff's retaliation claim survives as a matter of law where the employer issued a Performance Improvement Plan (PIP) and negative review shortly after Plaintiff filed an EEOC charge.

Plaintiff-Appellant says:  Yes.

Defendant-Appellee likely says:    No.

IV.    Whether Plaintiff's gender discrimination claim survives where a similarly situated male employee was permitted to work remotely while Plaintiff was not?

Plaintiff-Appellant says:  Yes.

Defendant-Appellee likely says:    No.

V.     Whether sufficient evidence of pretext exists to submit the case to a jury,

where the employer's investigation was biased, the stated reasons for discipline are disputed, and the timing of the adverse actions supports an inference of retaliation?

Plaintiff-Appellant says:  Yes.

Defendant-Appellee likely says:  No.

VI.     Whether sufficient evidence exists of a constructive discharge to submit the case to a jury, where the Appellant was badgered, harassed, demeaned,  humiliated, and was in the process of going through a pretextual discipline hearing?

Plaintiff-Appellant says:  Yes.

Defendant-Appellee likely says:  No.

s

## INTRODUCTION

This appeal challenges the district court's grant of summary judgment in favor of Defendant. The district court's decision did not adhere to the strictures of Federal Rule of Civil Procedure 56, which requires that all evidence be viewed in the light most favorable to the non-moving party. Instead of drawing reasonable inferences in favor of Ms. Noel, the district court resolved disputed issues of fact; such as the intent behind racially charged comments and the validity of comparator evidence; in favor of the Defendant.

Appellant, an African American woman who had been promoted to Human Resources Generalist, was forced to resign after being subjected to disparate treatment compared to her white and male colleagues, ostracized for reporting discrimination, and placed on a pretextual Performance Improvement Plan ("PIP").

The record is replete with evidence of animus, including explicit instructions to avoid hiring from African American neighborhoods and the disparate enforcement of remote work policies. By dismissing this evidence, the district court effectively usurped the role of the jury.

## STATEMENT OF FACTS

### A. Employment Background and Promotion

Plaintiff-Appellant Jerreece Noel began her employment with Defendant Challenge Mfg. Holdings, Inc. ("Challenge") on or around February 14, 2022, as a

Talent Acquisition Specialist. (R.23, PageID.952). She performed her duties with distinction, leading to her promotion to the role of Human Resources Generalist on or around October 23, 2022. (*Id.*).

This promotion came with increased responsibilities and a salary increase to approximately $70,000 per year. (R. 29, PageID. 1013). At the time of her promotion, there were no documented performance issues in her file, and she was considered a valued member, trained employees, and was promoted within eight months of being hired. (R. 19-2, PageID.240 85:16-19; PageID.24186: 6-12).

**B. Evidence of Racial Animus and Discriminatory Hiring Practices**

During her tenure, Appellant observed disturbing patterns of racial bias exhibited by her supervisor, Cheryl Brainard. (R. 19-2, 48:3-22). Appellant testified that Ms. Brainard gave explicit instructions regarding recruitment that were racially motivated. (R.19-2, Page ID 247, 92:7-9). Specifically, Appellant testified: "She specifically didn't want to hire people from Pontiac at all." (*Id.*). When asked to clarify the significance of this instruction, Appellant explained the demographic reality that made this instruction discriminatory: "Pontiac is primarily made up of African American people." (*Id*. at 92:17-18).

This was not an isolated comment but part of a broader pattern where African American employees were treated with greater contempt than their white counterparts. (R. 19-2, PageID.198-99, 43:6-44:9).[1]  Appellant explained:

> …I would hear her talking to Nichole Oleksiak about other workers that was out there on the floor that were hourly. Most of them were black individuals that she would be talking about.· And she would make jokes like they were dumb, and she would -- she'd be like duh, duh, duh, duh, like talking [] about people…she would use a slow type of tone and demeanor to describe what they were talking about. And I heard that on many different instances where she would be like [descriptive noise], and…she was talking about…the black workers that were there, like they were dumb and didn't…understand things.· So that's she would do. And then when she talked to me, she would talk in a -- a lower tone, or she would, you know, project her voice louder.· It was either a lower tone sometimes, or sometimes she would actually project her voice real loud, or sometimes she even yelled at me in the office.· And I just feel it wasn't right.· And I think that was because of my race, that I was African ·American. ·Because I didn't hear her yelling at Iris Kote, I didn't hear her yelling at Nichole or anything like that.· And -- yeah. She would yell at me, and…I didn't like it.· I knew it was wrong because I was working in human resources.

*Id.* Appellant observed that African American workers were frequently removed or disciplined for minor infractions, whereas Caucasian employees were not subjected

---

[1] Though not briefed in the summary judgment response, the record includes evidence that, Ibrahim Foryoh, recruiter from Pontiac, told Plaintiff that Brainard was racist and had also told him not to hire people from Pontiac. According to Plaintiff, he quit after telling Brainard to her face that she was racist. (R.19-2, PageID.389, 234:4-20)

to similar discipline for comparable infractions. (R. 19-2, PageID.281-82, 126:23-127:1). For example, Plaintiff explained how an African American employee was terminated shortly after he yelled at Appellant in public, despite the fact she would be publicly yelled at by her Caucasian manager quite frequently and the manager would not be punished. *Id.*

## C. Gender Discrimination and Disparate Treatment Regarding Remote Work

In addition to racial discrimination, Appellant was subjected to clear differential treatment based on her gender. Defendant allegedly maintained a policy prohibiting Appellant from working remotely, however, this policy was not applied to her male colleague, Jackson Mahle, a white male who held a similar position. (R. 19-6, PageID.545). Appellant testified unequivocally regarding this disparity: "I feel that I was not treated with the same…as my [] colleague, Jason [sic] Mahle... He was able to take his computer home and process his work when I was specifically told that I was not able to." (R.19-2, PageID. 362, 207:13-18).

## D. Protected Activity

Unable to tolerate the discriminatory environment and the biased hiring practices she was being asked to implement, Appellant engaged in protected activity. On or around November 4, 2022, she filed a formal charge of discrimination with the Michigan Department of Civil Rights and the Equal Employment Opportunity Commission ("EEOC"). (R. 19-2, PageID 312, 157:9-11). Additionally, Appellant

11

made multiple reports of conduct she took as discriminatory directly to her supervisors and even to corporate human resources.  R. 29 101-102; 104; R. 19-8, PageID 590).

### E.  Retaliation and Hostile Work Environment

Following the internal complaints of discrimination the workplace began to become more hostile, and after filing of her EEOC complaint, the atmosphere at work shifted from discriminatory to aggressively hostile and retaliatory: facing her first workplace punishment right thereafter.

Plaintiff testified that she was socially isolated and subjected to demeaning comments. Specifically, she testified: "[They] started making jokes about me... I felt that they were trying to say I was a crybaby because I said something about how I was being treated." (R. 19-2, PageID 328, 173:4-8). The term "crybaby" was used to demean her standing and dismiss her legitimate complaints about civil rights violations.  This labeling occurred in an open environment where management failed to intervene. *Id.*  Plaintiff further testified that she was ostracized by the team, making it nearly impossible to perform her job duties effectively. (R. 19-2, Page ID 336, 181:20-25).  Further, it was the office norm to publicly scold Plaintiff. (*Id.* at 44:1-9).  On one egregious occasion, a co-worker screamed at her to come to him by stating "come over here, woman. *(Id.* at 122:10-13). Plaintiff considered the tone to be akin to that of a slave master. (*Id.* at 126:7-13).

12

### F. The Pretextual Performance Improvement Plan

The retaliation culminated in formal disciplinary action. On or around March 13, 2023 just four months after she filed her EEOC discrimination charge; Defendant issued Plaintiff her first negative performance review and placed her on a Performance Improvement Plan ("PIP") (R. 19-2, 206:7-12).

Plaintiff testified that this performance review was factually flawed and designed to paper her file for termination. (R.19-2, PageID 356, 201:1-2). She stated: "I felt that that was very retaliatory in nature, and due to me filing the discrimination charges." *Id.*   Prior to her protected activity, Plaintiff had not received formal discipline. *Id.*   The sudden emergence of these "performance issues" immediately following her complaints – evidence of the "lying in wait" strategy, where an employer hoards grievances or fabricates them to justify retaliatory action.

### G. Constructive Discharge

The cumulative effect of the racial bias, the gender disparity, the social ostracization, the "crybaby" taunts, and the pretextual PIP created an intolerable working environment. Plaintiff began experiencing significant stress requiring medical treatment. (R.23, PageID.953).  Plaintiff testified:

> I felt that I was -- both of them being in the annual performance review interrogating me, asking me question after question until I feel sick, and then allowing it to go on for multiple days I think it -- it was like two-and-a-half days in total…it's usually an hour.
> …

13

> [Then] Ken telling me about he was going to have weekly meetings, I feel that was an intimidation scare tactic…

(R. 19-2, PageID.393, 238:5-17).  Plaintiff went on to testify as to another instance of clear intimidation when her supervisor made eye contact with Plaintiff, went into her office and blasted a song that repeated "I'm going to walk all over you" into Plaintiff's working quarters. (*Id.* at PageID.294, 239:12-18).

Realizing that the PIP was a sham designed to lead to her inevitable termination, and facing daily hostility, Plaintiff was constructively discharged and forced to resign on or around August 1, 2023, citing retaliation and Brainard's discrimination. (R. 23, PageID.954, R.19-2, PageID.389, 234:8-24).  At oral argument, her counsel explained the emotion recounting this period of time invoked during Plaintiff's deposition at the hearing for the motion for summary judgment:

> [Plaintiff's Counsel]: Yes, so Ms. -- and you weren't there. But during the deposition of [Ms. Noel], I mean, it was clear that her working conditions were intolerable. She was moved emotionally. It was really tough to continue on. She -- it's my position that a reasonable person would understand that she felt like she was being personally attacked. She thought the jokes about her were because she was trying to defend herself, which is why she was making the complaints because she was not comfortable in her working environment.

(R. 29, Page ID. 1000).

## <u>PROCEDURAL HISTORY</u>

Plaintiff filed suit in the Eastern District of Michigan alleging discrimination, retaliation, and a hostile work environment in violation of Title VII, 42 U.S.C. § 1981, and the Michigan Elliott–Larsen Civil Rights Act. (R. 1). Following discovery, Defendant moved for summary judgment on all claims. (R. 19).

Plaintiff opposed, arguing that genuine disputes of material fact existed regarding her constructive discharge, the disparate treatment compared to a similarly situated non-Black and male employees, and the pretextual nature of the disciplinary actions taken against her. (R. 23).

On July 29, 2025, the district court granted Defendant's motion for summary judgment from the bench based on its oral ruling. (R. 27, PageID.984; Hearing Tr., R. 29, PageID.1023–1031).

## <u>SUMMARY OF THE ARGUMENT</u>

This case continues a troubling pattern of trial courts denying plaintiffs their day in court by use of a test that effectively immunizes employers from discrimination claims. Evidence is viewed in a light most favorable to the defendant, and evidence that plaintiffs contend is concocted from whole cloth by employers is somehow enough to carry the day and shield the employer from liability before a jury ever gets to decide if they believe the employee. Affidavits and testimony of

employers are credited as valid and assumed to be true because they exist, while employee testimony is treated as "self-serving." Further, while the summary judgment standard is supposed to be based upon the record and facts, decisions turn on argument (or the purported lack thereof), rather than answering the only question that discrimination cases have been brought to decide: was this plaintiff unlawfully discriminated against by their employer?

Plaintiff urges the Court to redress the imbalance and uphold the fundamental right to a trial for all litigants.

Here, the district court's grant of summary judgment must be reversed because the trial court usurped the role of the jury. By weighing credibility, disaggregating evidence, and ignoring binding precedent regarding pretext and retaliation, the district court denied Plaintiff her right to a trial on genuine disputes of material fact.

First, regarding the claim of racial discrimination, the district court committed reversible error by failing to credit Plaintiff's testimony regarding the explicit discriminatory instructions given by her supervisor. The record establishes that supervisor Cheryl Brainard specifically instructed Plaintiff not to hire individuals from Pontiac; a city Plaintiff identified as being primarily made up of African American people (R. 19-2, 48:3-22).

This was not a stray remark; it was a directive to alter hiring practices based on geography as a proxy for race.  Under *Anderson v Liberty Lobby, Inc.*, 477 U.S. 242 (1986), credibility determinations and the weighing of such evidence are jury functions. "Maintenance of the jury as a factfinding body is of such importance and occupies so firm a place in our history and jurisprudence that any seeming curtailment of the right to a jury trial should be scrutinized with the utmost care." *Beacon Theatres, Inc. v. Westover*, 359 U.S. 500, 501 (1959) (citing *Dimick v. Schiedt*, 293 U.S. 474, 486 (1935)).  By dismissing this direct evidence of animus, the district court improperly substituted its own judgment for that of the fact-finder

Second, the district court erred in dismissing the hostile work environment claim by viewing the harassment in isolation rather than under the "totality of the circumstances" test mandated by the Sixth Circuit in *Jackson v. Quanex Corp.* 191 F3d 647 (6th Cir. 1999).

The court disaggregated the evidence, dismissing the "crybaby" insults and ostracization as mere remarks. However, when viewed cumulatively; an whistleblower being mocked as a "crybaby" by the very colleagues she reported, combined with a supervisor's racially biased hiring directives; a supervisor consistently publicly berating a subordinate, a co-worker yelling "come over here woman," pervasive ostracization and isolation, differing working mandates, as well as other harassment and mistreatment, cumulatively creates an environment an

17

environment that is objectively abusive under *Harris v. Forklift Systems, Inc*. 510 U.S. 17; 114 S Ct 367; 126 L Ed 2d 295 (1993).

Third, as to retaliation, the district court improperly granted summary judgment by focusing too narrowly on temporal proximity while ignoring the "lying in wait" doctrine and other ways that a plaintiff can show pretext. Although the district court found the four-month timeline insufficient, it failed to account for the evidence that Defendant had no documented performance issues with Plaintiff prior to her protected activity, comparator analysis, and other instances that show evidence of pretext.

The negative performance review and PIP "materialized" only after she filed her EEOC charge. As the Sixth Circuit clarified in *Montell v. Diversified Clinical Services, Inc.*, 757 F3d 497 (6th Cir. 2014) temporal proximity combined with such evidence of retaliatory conduct is sufficient to establish causation. A jury could reasonably infer that the PIP was a weapon of retaliation deployed at the first opportunity.

There is substantial evidence of pretext that should have been submitted to a jury. Under the three-part test in *Dews v. A.B. Dick Co.*, 231 F3d 1016 (6th Cir. 2000), Plaintiff at the very least presents evidence that the reasons for her discipline had no basis in fact, did not actually motivate the conduct, and were insufficient to warrant the action.

The evidence shows that the PIP was factually inaccurate, selective in its enforcement (as evidenced by the failure to discipline Mr. Mahle), and timed suspiciously to follow her protected activity. The district court failed to view the evidence of the biased investigation and the "lying in wait" strategy in the light most favorable to Plaintiff, thereby disregarding the Supreme Court's instruction in *Reeves v Sanderson Plumbing Prod,* 530 US 133; 120 S Ct 2097; 147 L Ed 2d 105 (2000) that a prima facie case combined with evidence of falsity permits a trier of fact to infer discrimination.

Fourth, the district court erred in its gender discrimination analysis by rejecting valid comparator evidence. Plaintiff testified unequivocally that she was strictly prohibited from working remotely, whereas her male colleague, Jackson Mahle, was permitted to do so.

Under *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F3d 344 (6th Cir. 1998) a plaintiff need only show that the comparator is similar in "relevant aspects." By ruling as a matter of law that Plaintiff and Mr. Mahle were not similarly situated despite holding similar roles, the district court ignored the disparate application of company policy and again played fact-finder.

Finally, the district court erred in ruling that Plaintiff was not constructively discharged as a matter of law because Plaintiff has shown ample evidence that she was harassed, badgered, and humiliated and that the PIP was pretextual. However,

19

the district court improperly made credibility determinations, did not provide Plaintiff with her rightful inferences and standards, and played the role of a fact finder all in clear prejudicial error which must be remedied by remanding this matter.

## STANDARD OF REVIEW

This Court reviews de novo a district court's grant of summary judgment. *Chapman v. Brentlinger Enters.*, 124 F.4th 382, 390 (6th Cir. 2024). Summary judgment is appropriate only when, viewing the evidence and all reasonable inferences in the light most favorable to the nonmoving party, there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

## ARGUMENT

## I.    PLAINTIFF'S CLAIMS OF RACIAL DISCRIMINATION SHOULD HAVE SURVIVED AS A MATTER OF LAW.

The district court erred in granting summary judgment on Plaintiff's racial discrimination claims. The court improperly weighed the evidence and failed to credit Plaintiff's testimony regarding the discriminatory instructions given by her supervisor.

Under Title VII, a plaintiff may prove discrimination through direct or circumstantial evidence. The Supreme Court in *Anderson v Liberty Lobby, Inc,* 477 US 242, 255 (1986) has explicitly held that at the summary judgment stage, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge."

21

In the case at bar, Plaintiff provided powerful testimony that her supervisor, Cheryl Brainard, gave her explicit instructions to avoid hiring individuals from Pontiac. Plaintiff testified that Brainard did not want to hire people from Pontiac, which she understood to mean not hiring Black people as applicants from Pontiac were primarily Black. (R.19-2, PageID 247, 92:7-18). Viewing the facts in a light most favorable to Plaintiff who heard Brainard say this, this was not a mere stray remark or an ambiguous comment. It was the manner in which the company was to conduct its hiring. This statement was a directive from a supervisor to a subordinate to alter hiring practices based on geography that serves as a proxy for race. By treating this testimony as insufficient or irrelevant, the district court substituted its own judgment for that of the jury. A reasonable juror could find that avoiding hiring applicants from certain cities manifested an intent to avoid minorities, as Plaintiff deduced based upon working with Brainard, particularly given how Plaintiff described how Brainard treated Black employees differently, as if they were dumb. (R. 19-2, PageID.198-99, 43:6-44:9). Discrediting this evidence as "isolated" constitutes reversible error.

Moreover, Plaintiff testified that while she was employed as a recruiter, and as the only African American present, her supervisor sent her home before a photo shoot because she believed Defendant did not want an African American woman in the photos. (R. 29, PageID.1011). Instead of creating a genuine issue of material

22

fact, the Court again looked for evidence from Plaintiff to present to rebut Defendant's contention it did not know the photographer was coming.  *Id.* at 1003. However, this is merely an explanation provided by Defendant. The jury does not have to believe it.

While it is theoretically possible, that a generous pro bono photographer was simply in the right place at the right time and just showed up to the event to take photographs of a holding company at a recruiting event, the jury must decide if the pro bono/"right place, right time" holding company photographer theory holds credence. Instead, Plaintiff believes the more probable, and most probable, conclusion that a reasonable juror would come to is a determination that Defendant did have knowledge of the photographer and hired him, as Plaintiff's testimony claims. However, at the very least, considering Plaintiff's inferences, this testimony and evidence presented in the lower court creates a genuine issue of material fact that should be reserved for the fact-finder.  However, again, the district court erred by playing that role of the fact finder and seemingly decided to credit Defendant's version of events.  This was error, and Plaintiff's claims should have been presented to a jury.

Plaintiff also testified to the fact that her supervisor was consistently and publicly yelling at her, and not at her non-African American co-workers, because of her race.  (R. 19-2, PageID.198 43:6 -199 44:9).  However, one employee was

23

disciplined after yelling at Plaintiff, but he was an African American male.  (R. 19-2, 126:23-127:1).  This same type of disparity can be seen in the work from home disparity discussed *supra*, in which a white male was permitted to work from home but Plaintiff was not.  Finally, Plaintiff testified that she would even notice a change in her supervisor's tone when discussing African American employees, implying they were dumb.  (R. 19-2, PageID.198 43:6 -199 44:9).

The lower court's decision to minimize the significance of Plaintiff's testimony and recount of events effectively stripped the jury of its constitutional prerogative to determine the facts. Determining the true motivation behind a supervisor's actions is a task uniquely suited for a jury, not a judge ruling on a paper record where credibility is at issue. A reasonable fact-finder could easily believe Plaintiff's account or not believe Defendant's justifications for the same activities. That is a question of fact, and with the inferences afforded to Plaintiff, and the facts must be presented to a jury for that role.  Instead, the district court did the opposite and unilaterally resolved any ambiguity in favor of Defendant, improperly acting as the ultimate weigher of credibility, intent, and fact which forced an improper conclusion that should have been tested through the rigors of a trial.

## II.    PLAINTIFF'S CLAIM OF HOSTILE WORK ENVIRONMENT CLAIM SHOULD HAVE SURVIVED AS A MATTER OF LAW.

The district court erred by dismissing Plaintiff's hostile work environment claim. The court incorrectly applied the standard for severity and pervasiveness by viewing the harassing incidents in isolation rather than as a cumulative whole.

The Supreme Court in *Harris v Forklift Sys,* 5510 U.S. 17, 21; 114 S Ct 367; 126 L Ed 2d 295 (1993) established that a hostile work environment exists when the workplace is "is permeated with "discriminatory intimidation, ridicule, and insult," *Harris*, 510 U.S. at 21, that is "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."

At the outset, the district court erred by holding Plaintiff to an improper standard of severe ***and*** pervasive.  (R. 29 Page ID 1006; 1008; 1031).  At the minimum, the claim should be remanded to the district court to determine the outcome under the proper "***or***" standard. *Harris,* 510 U.S. at 21 (quoting *Meritor Savings Bank, FSB* v. *Vinson,* 477 U. S. 57, 67 (1986) (…"sufficiently severe *or* pervasive"…) (emphasis added)).

Plaintiff testified that after she filed her discrimination charge, the environment became abusive. She was ostracized and subjected to jokes where coworkers called her a "crybaby" because she said something about how she was being treated. (R. 19-2, PageID 328, 173:4-8). The district court dismissed these comments as isolated from the other conduct that she described.

25

This approach violates the "totality of the circumstances" test mandated by the Sixth Circuit. In *Jackson v Quanex Corp,* 191 F3d 647, 660 (6th Cir. 1999), the Court explained that:

> In rejecting the narrow approach adopted by the district court in this case, we recently observed that when a lower court disaggregates the claims of a plaintiff alleging a hostile work environment, contrary to the "totality of circumstances" approach, it robs the incidents of their cumulative effect, and 'of course, when the complaints are broken into their theoretical component parts, each claim is more easily dismissed.'

citing *Williams v. Gen. Motors Corp*., 187 F.3d 553, 562 (6th Cir. 1999).

When a plaintiff is called a "crybaby" in the context of filing a civil rights charge, the term takes on a specific, retaliatory, and demeaning meaning. It is an attempt to shame the victim into silence. Plaintiff experienced the following issues:

1) Plaintiff's understanding that the supervisor refused to hire Black applicants from Pontiac;

2) Sending Plaintiff home to avoid being pictured with the company;

3) Holding different standards for different races of employees;

4) Making derogatory comments about Black employees;

5) Putting on music that had a threatening tone suggesting that Plaintiff would be "walked all over";

6) Being yelled at in a tone she believed sounded like a slave master;

7) Extending a performance review meeting that should have been an hour to a nearly three-day, long-form interrogation;

8) Following up the interrogation by threatening weekly recurring meetings;

9) Putting Plaintiff on a PIP at the same time as the lengthy "review."

The clear goal of this treatment was exactly what occurred: Plaintiff was forced to quit because the environment had become insufferable. The totality of the circumstances support that this information could be viewed by a reasonable person as hostile.

However, the district court only considered one of the comments and disregarded the rest of the evidence presented, holding that that "under the governing case law, this conduct simply does not rise to the level of a racially hostile work environment." (R. 29, PageID1031, 46:18-20). This was error, as the court failed to aggregate these acts.

The lower court's decision to dissect each incident of harassment individually stripped them of their collective power and contextual significance. By isolating the derogatory comments from the broader pattern of exclusion and the racially motivated hiring directives, the court effectively sanitized the record and ignored the reality of Plaintiff's daily experience.

A hostile work environment is rarely defined by a single catastrophic event but is instead constructed through a steady accumulation of slights, insults, and

27

exclusionary tactics that, when taken together, fundamentally alter the conditions of employment. In this case, the combination of being socially ostracized by colleagues, mocked for engaging in protected activity, and forced to implement discriminatory hiring practices, as well as the other circumstances discussed herein created an atmosphere that was oppressive and abusive.

Moreover, the dismissal of specific insults as mere stray remarks fails to appreciate the power dynamics at play when an essential whistleblower is targeted by the very people she has accused of wrongdoing. The use of demeaning language such as "crybaby" in response to a formal discrimination complaint is not an innocent or offhand comment; it is a direct attempt to belittle the employee and delegitimize her civil rights claims.

When this verbal harassment is permitted to flourish unchecked by management, it sends a clear message that the organization condones the hostility and views the complainant, rather than the discrimination itself, as the problem. Plaintiff made clear that the interrogation style of the performance review process made her dizzy and feel sick, and she felt that Defendant's agents were not sensitive to this, telling her to go back to work. (R.19-2, PageID.355-57, A jury should have been allowed to assess the cumulative weight of these actions to determine if they created an environment that a reasonable person would find

hostile or abusive, rather than having that determination made prematurely by the court.

### III.   PLAINTIFF'S RETALIATION CLAIM SHOULD HAVE SURVIVED AS A MATTER OF LAW.

The district court erred in granting summary judgment on the retaliation claim. The court focused too narrowly on the "temporal proximity" aspect and ignored the other evidence of pretext and the "lying in wait" theory.

To succeed on a retaliation claim, a plaintiff must show a causal connection between the protected activity and the adverse action. Plaintiff filed her EEOC charge on November 4, 2022. (R. 19-2, PageID 312, 157:7-12). On March 13, 2023, she was placed on a PIP. (R. 23, PageID.953).

The Sixth Circuit in *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008) has held that:

> Where an adverse employment action occurs very close in time after an employer learns of a protected activity, such temporal proximity between the events is significant enough to constitute evidence of a causal connection for the purposes of satisfying a prima facie case of retaliation.

The district court ruled that the timeline was insufficient, stating, "[b]ecause of this significant delay, temporal proximity alone does not give rise to an inference of causation here." (R. 29, Page ID1030, 45:9-10).

However, this ruling fails to consider the "lying in wait" doctrine and the other evidence of pretext presented.  The Sixth Circuit in *Montell v Diversified Clinical*

*Servs,*757 F3d 497, 506 (6th Cir. 2014), clarified that, "there are circumstances in which temporal proximity, when combined with other evidence of retaliatory conduct, is enough to establish a causal connection." (quoting *Spengler v. Worthington Cylinders,* 615 F.3d 481, 494 (6th Cir. 2010)).

Here, Plaintiff had no documented performance issues prior to her protected activity. The performance complaints "materialized" only after she accused the company of discrimination. Plaintiff testified, "I felt that that was very retaliatory in nature, and due to me filing the discrimination charges." (R. 19-2, PageID 356, 201:1-2).

A jury could reasonably conclude that the PIP was not a genuine tool for improvement, but a calculated weapon of retaliation deployed at the first opportunity (the annual review) to force Plaintiff out.   Even more, the nearly three-day performance review and threat of a weekly reoccurring type meeting would be further evidence of this theory.  The district court's failure to recognize this theory warrants reversal.

The concept of "lying in wait" is particularly relevant here because it fully explains the delay that the lower court used to dismiss the claim. An employer acting with retaliatory intent may not always terminate an employee immediately, particularly when they are aware that doing so would appear suspicious to an outside observer (i.e., a district court). Instead, employers choose to bide their time until a

scheduled performance review or other administrative event provides a convenient, neutral-sounding vehicle for their actions.

In this matter, the complete absence of documented performance issues prior to the protected activity, followed immediately by a harsh and comprehensive critique during the annual review process (and Plaintiff's dispute of the contents of the review[2]) fits this strategic pattern perfectly. By saving these alleged grievances for the formal review cycle, the employer attempted to veneer their retaliatory animus with procedural legitimacy, effectively hoarding complaints to weaponize them at the first available opportunity. The pretextual nature of the PIP, as discussed *infra*, fits this same pattern.

The lower court's rigid application of a temporal basis ignored the broader context of the workplace dynamics and the specific evidence of pretext. Retaliation is not always an immediate reaction; it can often be a calculated and sustained campaign designed to make an employee's tenure untenable over time – and ultimately force them to quit, as happened here.

When a worker with a previously unblemished disciplinary record is suddenly subjected to severe performance management measures shortly after reporting discrimination, the inference of a causal link remains strong even if a few months have elapsed. The abrupt shift in how the Plaintiff was evaluated, combined with the

---

[2] (R.19-2, PageID.353-56, 198:2-201:3)

manufacturing of performance deficits where none had previously been recorded, provides the necessary evidence to bridge the temporal gap. A jury should have been permitted to evaluate this sequence of events to determine whether the performance improvement plan was a sincere effort to help the employee or a pretextual instrument used to punish her for asserting her civil rights.

## IV.    PLAINTIFF'S CLAIM OF GENDER DISCRIMINATION SHOULD SURVIVE AS A MATTER OF LAW.

The district court committed reversible error by dismissing Plaintiff's comparator evidence regarding the remote work policy. The court improperly determined that Plaintiff and her male colleague, Jackson Mahle, were not "similarly situated."

To establish disparate treatment, a plaintiff is not required to demonstrate an exact correlation between himself and others similarly situated; rather, they must show only that they and their proposed comparators are similar in all *relevant* respects. *Bobo v UPS,* 665 F3d 741, 751 (6th Cir. 2012); *Ercegovich v Goodyear Tire & Rubber Co,* 154 F3d 344, 352 (6th Cir. 1998). A different rule would allow employers to have their insistence that two employees are too different to go untested. The reality is that companies with in-house counsel and/or legal teams, who often become involved in cases well before they ever reach the courthouse

steps, *never* have adequate comparators, because those individuals know the law and could always ensure that no two employees were exactly the same precisely in order to avoid a jury trial on comparators. This should not be permitted.

Plaintiff testified unequivocally: "I feel that I was not treated with the same – treated the same as my – my colleague, Jason Mahle [sic]... He was able to take his computer home and process his work when I was specifically told that I was not able to." (R. 19-2, PageID 362, 207:13-18).

The district court dismissed this evidence, stating: "Noel has also not demonstrated that she was treated differently than similarly situated employees." (Hearing Transcript., R.29, PageID.1025, 40:8-9).

Here, both employees worked in similar roles. One (white male) was allowed to violate the remote work policy without consequence; the other (Black female) was strictly prohibited from doing so. This is the textbook definition of disparate treatment. Plaintiff was given no reason why she and Mahle would have different policies on taking their laptops home to do work. Whether Defendant's excuse for this disparity is credible is a question for the jury, not the judge.

The district court's rigid application of the "similarly situated" standard failed to account for the practical realities of the workplace and the core purpose of anti-discrimination law. The legal requirement for a comparator does not demand that two employees be identical in every possible way, but rather that they be similar in

the aspects relevant to the misconduct or policy at issue.  In this instance, the relevant aspect was the enforcement of the company's remote work policy. Both Plaintiff and her male colleague held comparable positions and were subject to the same rules (Defendant has never presented a different policy for Mahle), yet Defendant chose to enforce those rules strictly against the Black female Plaintiff while allowing her white male counterpart to violate them without repercussion. This selective application of workplace policies creates a clear inference of discriminatory intent that cannot be dismissed as a mere administrative oversight or management discretion.

Furthermore, Defendant's explanation for this disparity relies entirely on credibility determinations that belong exclusively to a jury. By accepting the employer's defence that it was unaware of the male employee's conduct until later (even though he was clearly and openly discussing taking his computer home), or that his situation was somehow distinguishable, the district court improperly weighed the evidence and resolved a genuine dispute of material fact in favor of the moving party.

A reasonable jury could view the failure to discipline the white male employee, even after his conduct was discovered, as evidence that the policy was never intended to be applied neutrally. Because the record contains specific testimony regarding this differential treatment, the question of whether gender

34

and/or race (or the intersection of the two) motivated the disparity was a factual issue that should have been preserved for trial rather than dismissed on summary judgment.

## V.   THERE IS EVIDENCE OF PRETEXT.

The district court erred in finding no evidence of pretext. Once a plaintiff establishes a prima facie case, the burden shifts to the defendant to offer a legitimate reason for the action. The plaintiff must then show that this reason is pretextual.

As explained in *Dews v AB Dick Co*, 231 F3d 1016, 1021 (6th Cir. 2000), a plaintiff can demonstrate pretext by showing that the given reason, "(1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct."

In this case, Plaintiff has presented evidence under all three prongs,

1. *No Basis in Fact*: Plaintiff testified that the performance criticisms in the PIP were inaccurate and ignored her successes[3];

2. *Did Not Motivate Conduct*: The "lying in wait" timing suggests that the true motivation was retaliation, not performance;

3. *Insufficient to Warrant Conduct*: The failure to discipline Mr. Mahle for policy violations suggests that policy enforcement was selective and insufficient to warrant the strict treatment of Plaintiff.

---

[3] (R.19-2, PageID.348, 193:17-24)

As the Supreme Court noted in *Reeves v Sanderson Plumbing Prod,* 530 US 133, 148; 120 S Ct 2097; 147 L Ed 2d 105 (2000).: "a plaintiff's prima facie case of discrimination…combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated."

Plaintiff testified multiple times about how the investigation done into her complaints of discrimination were disregarded by management, not done in good faith, and "swept under the rug." (R.19-2, 90:15-92:8, 97:22-98:18, 168:13-169:12, 170:1-20, 179:1-13). The district court failed to view the evidence of the sham investigations and the selective discipline as evidence of pretext. When an employer conducts a biased investigation; ignoring the "crybaby" comments and excusing the male comparator; it forfeits the "honest belief" defense. A reasonable jury could find that Defendant's actions were motivated by discriminatory and retaliatory animus.

The district court failed to view the evidence of the sham investigation and the selective discipline as evidence of pretext. The district court's reliance on Defendant's internal investigation was misplaced because the inquiry was fundamentally flawed.

An employer cannot hide behind the honest belief rule when it conducts a cursory or biased investigation that wilfully ignores corroborating evidence of hostility. By accepting the statements of the accused harassers at face value while

36

disregarding Plaintiff's consistent reports of being ostracized and demeaned, Defendant failed to make a reasonably informed decision.

This lack of objectivity transforms the investigation from a fact-finding mission into a tool for exoneration, thereby stripping the Defendant of any protection under the honest belief doctrine and creating a clear factual dispute for the jury.

Furthermore, the selective enforcement of company policy against the Plaintiff, while simultaneously excusing identical conduct by her male counterpart, provides powerful evidence that the stated performance concerns were not the true motivation for her discipline.

A plaintiff may demonstrate pretext by showing similarly situated employees who were not within the protected class were treated more favorably than the plaintiff. *Dixon v WW Granger*, 168 Mich App 107, 116-117; 423 NW2d 580 (1987); Evidence that Defendant failed to follow its own employment policies is evidence of pretext. *Harrison v Metropolitan Govt of Nashville,* 80 F3d 1107, 1117 (6th Cir 1996). Plaintiff's favorable performance reviews should be considered in determining pretext. *Logan v Denny's, Inc.*, 259 F.3d 558, 575 (6th Cir 2001).

When this disparate treatment is viewed alongside the suspicious timing of the Performance Improvement Plan; which appeared only after the Plaintiff exercised her civil rights; the inference of pretext becomes unavoidable. A reasonable jury examining this record could readily conclude that the Defendant

37

weaponized its performance review process not to address legitimate business needs, but to punish the Plaintiff for her protected activity and to force her resignation through a calculated campaign of retaliatory animus.

## VI.    THE DISTRICT COURT ERRED BY HOLDING THERE WAS NO CONSTRUCTIVE DISCHARGE AS A MATTER OF LAW

The district court correctly stated, "Courts consider factors like whether an employer demoted the employee, reduced her salary, reduced her job responsibilities, reassigned her to menial or degrading work, _or badgered, harassed, or humiliated her to encourage her to resign_. _Torres v. Chad Youth Enhancement Center_, 2009 Westlaw 2850709, at *2 (Middle District of Tennessee) (September 1, 2009), citing _Logan v. Denny's, Inc.,_ 259 F.3d 558, 569 (6th Cir. 2001). (R. 29 PageID 1023) (emphasis added).  However, in the following sentence, the district court erroneously stated, "Challenge took no such actions against Ms. Noel…"  This position by the lower court completely disregards Plaintiff's entire position, evidence, and testimony and represents the continuing theme of the Court disbelieving Plaintiff, not providing Plaintiff with her proper inferences or standards, and improperly playing the role of fact-finder.

Plaintiff's position, as laid out herein, is that she was continually harassed, badgered, and humiliated.  She was publicly yelled at by her supervisors and other co-workers.  (R.19-2, 126:23-127:1).  Additionally, she was called crybaby as a nickname around her office leading to ostracization after she complained.  A prime

38

example of the intimidation and harassment she was forced to endure is when her supervisor looked at her, went into her office, and started blaring the song "these boots were made for walking" in what Plaintiff took as directly antagonistically pointed at her.  Moreover, the fact she was forced to endure a nearly three-day performance review, when they are generally an hour long, is another clear example of badgering and harassment.  Finally, being asked to complete weekly follow-ups related, and implicitly just as long, is further evidence of the same badgering and harassment.  This would turn half of Plaintiff's work week into discussing her deficiencies with her bosses if the follow-ups were to take the same amount of time. A jury could find this demeaning, menial, and degrading work, and determine that it was reasonable for Plaintiff to resign.

Plaintiff avers that the analysis concerning Defendant's intent directly relates to the retaliation claim. While the district court expressed skepticism regarding Plaintiff's veracity, it is well-established that determining witness credibility and weighing conflicting evidence presents a genuine issue of material fact inappropriate for summary judgment. The record contains sufficient evidence to demonstrate a triable issue of fact concerning the retaliatory motive. The district court's continued resolution of these factual disputes constitutes reversible error, and the matter should be remanded for a jury to determine whether Defendant's actions were undertaken in good faith.

39

## <u>CONCLUSION AND REQUESTED RELIEF</u>

For the foregoing reasons, Plaintiff respectfully submits that the district court erred in granting summary judgment in favor of Defendant. Genuine issues of material fact exist as to Plaintiff's claims of race discrimination, hostile work environment, retaliation, etc. which must be resolved by a jury. Accordingly, Plaintiff respectfully requests that this panel reverse the judgment of the district court, remand the case for trial on the merits, and grant such other and further relief as this panel deems just and proper, including costs and fees.

Dated: January 14, 2026                      Respectfully Submitted,

                                        /s/ *Carla D. Aikens*
                                        Carla D. Aikens (P69530)
                                        Connor B. Gallagher (P82104)
                                        CARLA D. AIKENS, P.L.C.
                                        Attorneys for Plaintiff
                                        615 Griswold St., Ste. 709
                                        Detroit, MI 48226
                                        carla@aikenslawfirm.com

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that the foregoing brief complies with the type volume limitations pursuant to Fed. R. App. P. 32(a)(7)(B). The foregoing brief contains 7,003 words of Times New Roman 14-point proportional type. The word processing software used to prepare this brief was Microsoft Word.

Dated: January 14, 2026　　　　　　　　　　/s/ *Carla D. Aikens*

## ADDENDUM

## DEISNGATION OF RELEVANT DISTRICT COURT DOCUMENTS

| Record Entry No. | Document Description | Page Number of Electronic Record |
|---|---|---|
| R.19-2 | Plaintiff's Deposition Transcript | PageID.155-413 |
| R.19 | Defendants Motion for summary Judgement | PageID.114-152 |
| R.23 | Plaintiff's Response to Motion for Summary Judgment | PageID.947-967 |
| R.27 | Order Granting Summary Judgment | PageID.984 |
| R.28 | Judgement | PageID. 985 |
| R.29 | Transcript of Motion Hearing | PageID.986-1036 |

## CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing instrument was served upon all parties to the above cause to each of the attorneys of record herein through the electronic filing system on January 14, 2026 by:

*/s/ Katarzyna Nowicki*